# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

DESMOND QUICK,

                    Plaintiff,

       v.                                    9:12-CV-1717 (DNH/ATB)

HAROLD GRAHAM,

                    Defendant.

_____

DESMOND QUICK, Plaintiff, *pro se*
COLLEEN D. GALLIGAN, Ass't Att'y Gen., for the Defendant

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

    Presently before the court is defendant Graham's second motion for summary judgment, pursuant to Fed. R. Civ. P. 56. (Dkt. No. 116). Plaintiff filed a response in opposition to defendant's motion. (Dkt. No. 124). The summary judgment motion was referred to me for Report and Recommendation on March 12, 2015 by U.S. District Judge David N. Hurd, pursuant to 28 U.S.C. § 636 (b) and Local Rules N.D.N.Y. 72.3(c).

    The sole remaining civil rights claim against defendant Graham in plaintiff's Fourth Amended Complaint (Dkt. No. 99) relates to plaintiff's confinement, for a total of 23 days between and including July 2012 and February 2013, by the New York Department of Corrections and Community Supervision ("DOCCS") in an observation cell of the Residential Crisis Treatment Program ("RCTP") at the Auburn Correctional

Facility ("Auburn").[1]  Plaintiff alleges that, while confined in the RCTP, he was subjected to cruel and unusual punishment under the Eighth Amendment because his observation cell was constantly illuminated with bright overhead lights that were never dimmed, which "caus[ed] difficulty sleeping" and exposed him to the "psychophyisiological problems" associated with sleep deprivation.  (Fourth Am. Compl. at 8).  Plaintiff demands substantial compensatory and punitive damages.  (*Id*. at 9).

Defendant Graham argues that plaintiff cannot establish that his confinement in the RCTP caused a serious deprivation of his basic human needs, as required to support his Eighth Amendment claim.  Defendant also contends that the continuous lighting conditions in the RCTP were necessary to meet the penological and security needs of DOCCS,[2] and that Supt. Graham was not, as a matter of law, deliberately

---

[1] Plaintiff's claim with respect to earlier periods of confinement in the RCTP in March and April 2012 was dismissed in response to defendant Graham's first summary judgment motion based on his lack of personal involvement prior to June 2012, when Supt. Graham denied an appeal of plaintiff's first grievance relating to the lighting in the RCTP.  *See* 8/5/2014 Report-Recommendation and Order at 21-24 (Dkt. No. 86), adopted by 9/11/2014 Decision and Order of Judge Hurd (Dkt. No. 98), reported at 2014 WL 4627108.  Defendant Graham's current summary judgment motion has **not** challenged plaintiff's claim with respect to lighting conditions in the RCTP from July 2012 through February 2013 based on a lack of Supt. Graham's personal involvement.

[2] Defendant Graham appears to have abandoned the position that he took in connection with his first summary judgment motion that the lighting in the RCTP observation cells was reduced, during night-time hours, from two 32-watt light bulbs to a 9-watt LED nightlight.  As discussed further below, Supt. Graham's statement of the penological justification for the lighting conditions in the RCTP in connection with his first summary judgment motion was based on the assumption that the lights in the RCTP were generally dimmed at night.  Defendant Graham conceded that "the illumination cast by the 9-watt nightlights" was sufficient to satisfy DOCCS' security needs with respect to inmates not on suicide watch.  (Graham 4/16/ 2014 Decl. ¶¶ 12-15, Dkt. No. 72-10).

indifferent to plaintiff's health and safety.  Finally, defendant Graham argues that he should be protected from liability for damages based on qualified immunity because no clearly established constitutional right of plaintiff was violated by the lighting conditions in the RCTP.

The court has determined that no rational fact finder could conclude that plaintiff can establish that the lighting conditions in the RCTP during the relevant time period caused him "serious" harm.  Accordingly, the court recommends that defendant Graham's second motion for summary judgment be granted and plaintiff's remaining Eight Amendment claim be dismissed.  Having concluded that plaintiff cannot establish that his Eighth Amendment rights were violated, the court need not resolve the issue of qualified immunity.

## OVERVIEW OF RELEVANT FACTS

It is undisputed that plaintiff was confined in an RCTP observation cell at Auburn on July 17 and 18, 2012; from August 22 through August 28, 2012; from December 22 through December 24, 2012; from January 27 through February 4, 2013; and from February 4 through February 6, 2013.[3]  (Def. Stmt. of Mat. Fact ¶ 4 (Dkt. No. 116-1); Plaintiff's Response ¶ 4 (Dkt. No. 124-2 at 1)).  On or about February 4, 2013, plaintiff filed his second grievance at Auburn (# AUB62587-13) with respect to

---

[3] Further background, and the details regarding plaintiff's earlier confinement in the RCTP, are set forth in my prior Report-Recommendation and Order (at pp. 4-8, Dkt. No. 86, 2014 WL 4627108).  The court assumes the reader's familiarity with the background presented in my prior opinion.

conditions at the RCTP,[4] alleging "I have been kept under constant lighting full blast 24 hours a day without the light being dimmed at night which caused loss of sleep and constant headaches. . . . A lot of times when I go to the satellite my mental health problems become worst do [sic] to the environment." Plaintiff also complained that the mattress and smock given to him in the RCTP were "filthy." (Graham 3/2/2015 Decl., Ex. B, Dkt. No. 116-4 at 4; Dkt. No. 117-1 at 12-13).[5]

Supt. Graham states that he investigated plaintiff's grievance with respect to lighting conditions at the RCTP, referring the issue with respect to the cleanliness of the mattress and smocks to the New York State Office of Mental Health's Central New York Psychiatric Center ("OMH/CNYPC") Risk Management for further investigation. (Graham 3/2/2015 Decl. ¶ 16 & Ex. B at 5, Dkt. No. 116-4).[6] Supt. Graham alleges that, in reviewing plaintiff's grievance, he

> . . . took into account Staff observations and complaints that they could not see into the RCTP cells during the night time due to improper lighting and the tightly woven metal screen that covers the front of the cell. The screen is in place to help protect staff from being thrown on by the inmates. However, it also hinders the view into the cell. Staff assigned to the RCTP need to see clearly into each cell during rounds every 15 minutes. When the cell lights are left on, RCTP Staff have a complete view of the inmate and can detect if the inmate is attempting to harm himself. . . . It is essential for the DOCCS and

---

[4] Plaintiff's first grievance, relating to his confinement in the RCTP in March and April 2012, was filed in April 2012 and is attached as an exhibit to plaintiff's first set of motion papers. (Dkt. No. 63-4 at 1-10).

[5] The copy of plaintiff's second grievance attached to Supt. Graham's declaration omitted the second page, which was included as an exhibit elsewhere in defendant's motion papers.

[6] While OMH/CNYPC is responsible for providing mental health care to inmates confined in the RCTP at Auburn, DOCCS personnel at the facility remain responsible for security within the RCTP. (Graham 3/2/2015 Decl. ¶ 8, Dkt. No. 116-2).

OMH staff to be able to monitor RCTP inmates at all times in order to ensure that the inmates' mental health conditions do not deteriorate and they do not attempt to harm themselves, especially if the inmate is on 1:1 suicide watch.

(Graham 3/2/2015 Decl. ¶¶ 18, 19).[7]

Supt. Graham emphasizes that plaintiff's subsequent appeals of the grievance decisions focused on the issue of the "filthy" mattresses and smocks issued in the RCTP, and not the lighting issue. (Graham 3/2/2015 Decl. ¶ 22 & Ex. B at 5). However, the defendant seems to ignore that plaintiff wrote a follow-up grievance to Risk Management at CNYPC, which was tasked with investigating at least part of plaintiff's grievance, complaining further about lighting in the RCTP:

I have also wrote [sic] . . . concerning the light being kept on full blast 24 hours a day without ever being dimmed at night on the 11-7 shift which . . . is torture after a few days you start to suffer sleepless nights, headaches, and delusions in the Mental Health Unit Observation cell."

(Dkt. No. 63-4 at 19-20).

Plaintiff's characterization, at various times, of the harm he suffered as a result of the lighting conditions in the RCTP range from dramatic claims of "torture," as

---

[7] Despite acknowledging that the RCTP cells were covered with "thin-woven, black, metal mesh screening," Supt. Graham, stated, in the declaration provided in connection with the first round of motions: "As a general rule, the overhead daytime lights are turned on each morning at approximately 7:00 a.m., and are kept on through the evening count, at approximately 10:30 p.m. . . . While the illumination cast by the 9-watt nightlights is unobtrusive, it is sufficient to allow the DOCCS and OMH staff to see into the cells and observe the RCTP inmates at all times, and to allow the inmates to be monitored by video from the Officer's Station." (Graham 4/16/2014 Decl. ¶¶ 10, 12-13, Dkt. No. 72-10). In his more recent declaration, Supt. Graham claims that he was advised by DOCCS and/or OMH staff felt the brighter daytime lighting was necessary to properly monitor all inmates in the RCTP at night. (Graham 3/2/2015 Decl. ¶ 18, Dkt. No. 116-2). But defendant Graham provides no explanation for the apparent change in his position with respect to the brightness of the lighting required for the OMH and DOCCS staff to adequately monitor inmates in the RCTP holding cells.

quoted above, to more benign references to "discomfort and interfer[ence] with his ability to sleep" (Pl.'s Mem. of Law at 6, Dkt. No. 124 at 7).  Defendant has submitted all of plaintiffs' medical and mental health treatment records during the relevant time period.  As discussed below, those records include numerous inconsistent statements by plaintiff relating to his ability to sleep in the RCTP, and reflect the absence of complaints to the medical staff  by plaintiff about the harms purportedly suffered as a result of alleged sleep deprivation in the RCTP.

## DISCUSSION

### I.    Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts

showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Id.,* 2006 WL 1133247, at *3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some

assessment of the plaintiff's account.")).

II.     **Conditions of Confinement**

    A.     **Applicable Law**

        1.     **Eighth Amendment**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, **and** (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 199) (citing

*Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*.

## 2. Constant Illumination

"[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. May 23, 2013) (citing, *inter alia*, *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 367 (N.D.N.Y. 2010)) ("Courts have previously recognized that sleep constitutes a basic human need and conditions [including constant illumination] that prevent sleep violate an inmate's constitutional rights."). "Requiring inmates to live in constant illumination can . . . , under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock*, No. 9:12-CV-447 (NAM/TWD), 2013 WL 4804500, *10 (N.D.N.Y. Sept. 6, 2013) (citing, *inter alia*, *Keenan v. Hall*, 83 F.3d 1083, 1090-91

(9th Cir. 1996) (an allegation that large fluorescent lights directly in front of and behind an inmate's cell that shown into his cell twenty-four hours a day, causing him grave sleeping problems and other mental and psychological problems stated a claim of cruel and unusual punishment that could withstand a motion for summary judgment). *See also Holmes v. Grant*, No. 03 Civ. 3426, 2006 WL 851753, at *3, 11-12 (S.D.N.Y. Mar. 31, 2006) (denying motion to dismiss plaintiff's claim that 24-hour illumination of the SHU during his 35 days of confinement caused fatigue, loss of appetite, migraine headaches, and other physical and mental problems because, as alleged, it would sustain both the objective and the subjective prongs of an Eighth Amendment analysis) (collecting cases).

The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very "fact-driven," generally turning on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting. *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at *18-19 (N.D.N.Y. Mar. 31, 2014) (given the penological justification offered by defendant, continuous lighting of SHU with a nightlight did not violate plaintiff's Eighth Amendment rights) (citing, *inter alia*, *McGee v. Gold*, No. 1:04-CV-335, 2010 WL 5300805, at *5 (D. Vt. Aug. 3, 2010) (recommending summary judgment and dismissal of plaintiff's Eighth Amendment claim regarding 24-hour security lighting "no brighter than a 'standard night light'" given the lack of harm to plaintiffs and penological justification presented by defendants) (Rep't-Rec.), *adopted*, *sub nom. McGee v. Pallito*, 2010 WL 5389996 (D.

10

Vt. Dec. 20, 2010), *vacated and remanded on other grounds sub nom. Kimber v. Tallon*, 556 F. App'x 27 (2d Cir. 2014); *Chappell v. Mandeville*, 706 F.3d 1052, 1058-59 (9th Cir. 2013) (comparing cases and distinguishing *Keenan*).  Some authority, however, questions the appropriate role of penological justification in the context of an Eighth Amendment conditions-of-confinement claim.[8]

## B.    Analysis

The relevant medical and mental health records relating to the plaintiff, which the defendant submitted for the first time in connection with his current summary judgment motion, provide little, if any, support for the plaintiff's dramatic claims of sleep deprivation, chronic headaches, and exacerbation of his mental health symptoms attributable to the lighting conditions at the Auburn RCTP.  On April 29, 2012, plaintiff supplemented his first grievance to raise the lighting conditions in the RCTP

---

[8] The Ninth Circuit in *Grenning v. Miller-Stout*, noted:
> The precise role of legitimate penological interests is not entirely clear in the context of an Eighth Amendment challenge to conditions of confinement.  The Supreme Court has written that the test of *Turner v. Safley*, 482 U.S. 78 . . . (1987), which requires only a reasonable relationship to a legitimate penological interest to justify prison regulations, does not apply to Eighth Amendment claims. *Johnson v. California*, 543 U.S. 499, 511 . . . (2005) ("[W]e have not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison. . . .) . . . The existence of a legitimate penological justification has, however, been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes. *See Rhodes v. Chapman*, 452 U.S. 337, 346 . . . (1981) ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'")

*Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014) (some citations omitted).  Other courts which have considered penological justification in the context of claims involving continuous prison lighting have related it to the subjective prong of the Eighth Amendment analysis. *See, e.g., Chavarria v. Stacks*, 102 F. App'x 433, 436 (5th Cir. 2004) (plaintiff cannot establish the subjective element of an Eighth Amendment violation because he cannot show that his deprivation is unnecessary and wanton, given the security-related justification for the lighting policy in the administrative segregation area).

and to claim that he was "now suffering from migraine headaches" as a result of sleep deprivation during his RCTP confinement in March and April 2012. (Dkt. No. 63-4 at 4).[9] Plaintiff's Ambulatory Health Record ("AHR") Progress Notes document that he was seen by medical personnel at Auburn on six occasions between his release from the RCTP, on April 17, 2012, and May 6, 2012. Plaintiff raised a variety of medical issues, including skin problems and "different pain all over," but did not once mention headaches, including on April 29th–the day he wrote the supplement to his grievance. (Dkt. No. 119 at 55-57).

Plaintiff was confined in the RCTP at the Sullivan Correctional Facility ("Sullivan") between June 28 and July 16, 2012.[10] During various sessions with the mental health staff at the Sullivan RCTP, plaintiff raised a host of complaints about real or imagined abuse he suffered while confined in the Auburn special housing unit ("SHU"), *e.g.*, by frequently claiming that correction officers in the SHU were contaminating his food. (*See, e.g.*, Dkt. No. 118 at 20, 22, 24, 62, 71, 73, 76, 79, 85). Plaintiff complained that the **SHU staff** interfered with his sleep by making banging and whistling noises (Dkt. No. 118 at 62), but raised no complaints about the Auburn RCTP relating to the lighting, his problems sleeping there, or otherwise. The mental health staff concluded that plaintiff was attempting to manipulate mental health services for secondary gain–*i.e.*, to avoid returning to the Auburn SHU. (*See, e.g.*,

---

[9] As noted earlier, plaintiff's confinement at the Auburn RCTP in March and April 2012 is not part of plaintiff's surviving claim in this action.

[10] Plaintiff's confinement at the RCTP at Sullivan is not part of his claim in this case, but his comments to the mental health staff at Sullivan are relevant to this claim.

Dkt. No. 118 at 71, 85, 88).

Plaintiff was returned to Auburn on July 17, 2012 and was admitted to the Auburn RCTP when he threatened self-harm. (Dkt. No. 118 at 5). The next day, he reported to the RCTP staff that "he has been eating and sleeping well" and agreed to return to the Auburn SHU. (Dkt. No. 118-1 at 10).

Plaintiff was next admitted to the Auburn RCTP on August 22, 2012 because of threats of self-harm apparently related to his concern about facing further criminal charges, and problems in the SHU. (Dkt. Nos. 118 at 8, 32; 118-1 at 26, 29, 37). On August 24th, plaintiff reported to the mental health staff that "his sleep and appetite are normal and within average range." (Dkt. No. 118-1 at 32). RCTP progress notes on August 25th, 26th, and 27th reported that plaintiff had "no complaints." (Dkt. No. 118-1 at 35, 36, 39). On August 28, 2012, plaintiff agreed to return to the SHU noting that he was "'tired of being down here,' referring to RCTP." (Dkt. No. 118-1 at 40).

Plaintiff's medical progress notes between July 19 and November 19, 2012 reflect that he was seen by the medical staff more than 20 times, complaining of a variety of ailments–e.g., kidney and back pain and recurring skin problems. (Dkt. No. 119 at 31-46). During this time period, plaintiff requested Tylenol and/or Motrin for intermittent headaches on three occasions, starting about a month after his last stay in the RCTP–September 27, October 25, and November 18, 2012–without any mention of sleep issues or prior RCTP confinement. (Dkt. No. 119 at 31, 36, 42). At the time of his September complaint, plaintiff also complained of vision problems, which resulted in a new prescription for eyeglasses. (Dkt. Nos. 119 at 42; 119-1 at 36, 40, 41). With

respect to the last two complaints about headaches, plaintiff was also reportedly suffering from nasal congestion at or around the same time. (Dkt. No. 119 at 31, 36, 38).

On November 23, 2012, plaintiff was admitted to the infirmary for one-on-one suicide watch because he made a threat of self-harm. (Dkt. No. 119-1 at 6-7). He advised the mental health staff that the reason for wanting to harm himself was "because I can't sleep" in the SHU. (Dkt. Nos. 118-1 at 57; 119-1 at 8). It was established in connection with the first round of summary judgment motions that the lighting in the observation cells for Auburn inmates on suicide watch were never dimmed. (8/5/2014 Report-Recommendation and Order at 6-7, Dkt. No. 86). The logs from plaintiff's suicide watch indicated that plaintiff slept from 1:00 a.m. until 6:45 a.m., and asked to be returned to SHU later that day. (Dkt. Nos. 117-1 at 5-6; 118-1 at 57). Plaintiff was also placed on a suicide watch in the infirmary on December 21, 2012[11] because of a threat of self-harm, which he again admitted was motivated by his desire to get out of the SHU so he could "get some sleep." (Dkt. Nos. 118-1 at 63; 119-1 at 9-10). The suicide watch log indicated that plaintiff did not sleep much of the night, but was returned to the SHU the next morning. (Dkt. No. 117-1 at 2-3; 118-1 at

---

[11] Plaintiff's remaining Eighth Amendment claim relates to the lighting conditions in the RCTP during other time periods between July 2012 and February 2013 when he was **not** on one-on-one suicide watch. As discussed in my prior Report-Recommendation (at pp. 26-30, Dkt. No. 86), defendant Graham would, based on the undisputed facts, be entitled to qualified immunity with respect to the use of continuous, bright lighting to monitor Auburn inmates who were on one-on-one suicide watch.

63).[12]

Plaintiff was next admitted to the RCTP on December 22, 2012, based on threats of self-harm, admittedly motivated by his belief that correction officers placed a generator-type machine on the catwalk behind his SHU cell which caused his entire cell to vibrate and prevented him from sleeping. (Dtk. No. 118-1 at 64, 67). On December 24th, "[w]hen asked if he slept in observation, the [plaintiff] stated 'they left the light on all night, so I'm ready to go back to SHU.'" (Dkt. No. 118-1 at 67). At sick call on December 29th, plaintiff complained of a headache and congestion and was given Motrin and cold medication. (Dkt. No. 119 at 25). During several sessions with the mental health staff in January 2013, plaintiff repeated that he threatened self-harm so he could go to the RCTP in December because the correction officers in the SHU were keeping him up, and he wanted to get sleep. (Dtk. Nos. 118 at 54; 118-1 at 76, 78, 80, 81).

Plaintiff's last period of confinement in the RCTP occurred between January 27 and February 6, 2013. (Dkt. No. 117-2 at 1-43). In his February 14, 2013 grievance, discussed above, plaintiff claimed that the constant bright lighting in the RCTP caused "loss of sleep and constant headaches." (Dkt. No. 116-4 at 4; Dkt. No. 117-1 at 12-13). The AHR progress notes reflecting plaintiff's medical treatment in the days prior to submitting his grievance reflect only treatment of self-inflicted scratches, and make no reference to headaches. (Dkt. No. 119 at 18-19). The next reference to a headache

---

[12] It should be noted that plaintiff never complained about the lighting in the infirmary or about sleep problems there. As discussed further below, plaintiff did complain that correction officers in the SHU interfered with his sleep by making noise.

in plaintiff's medical records was upon his reception at Green Haven Correctional Facility on April 26, 2013, two and one-half months after his release from the Auburn RCTP. (Dkt. No. 119 at 2, 17). At his continued deposition in this case on December 16, 2014, plaintiff could not recall any further problems with the conditions of his confinement in the Auburn RCTP between July 2012 and February 2013, other than the "torture" of the constant lighting. (Dkt. No. 117-3 at 13, 18, 22-23).

As detailed above, plaintiff's conclusory and often inconsistent descriptions of the harm he allegedly suffered as a result of the lighting conditions in the RCTP were not supported, and were often directly contradicted, by the documentary evidence relating to his mental health and medical treatment. For example, while plaintiff claimed in grievances to be tortured by sleep deprivation because of the continuous lighting in the RCTP, he repeatedly told mental health care providers that he feigned suicidal intentions so he would be moved from the Auburn SHU to the RCTP to get some sleep. Plaintiff did not deny the content of the medical and mental health records submitted in support of the second summary judgment motion, but plaintiff did not admit the truth of the various statements attributed to him therein. (Pl.'s Resp. to Stmt. of Mat. Fact, Dkt. No. 124-2 at 2-3). However, plaintiff's blanket denial of all of his contradictory statements to a wide variety of medical and mental health providers both at Auburn and Sullivan would not be sufficient to persuade any reasonable fact finder to rely on plaintiff's conclusory claims of serious harm. *See, e.g., Lewis v. Johnson*, No. 9:08-CV-482 (TJM/ATB), 2010 WL 3785771, at *19 (N.D.N.Y. Aug. 5, 2010) (Rep't-Rec.), *adopted*, 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010) (plaintiff's

conclusory allegations about his denials of medical care would not create an issue of fact given the contradictory records of examinations on several occasions by different providers in two facilities who found little evidence of the medical problems about which plaintiff complained); *Brown v. White*, 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Brooks v. Rock*, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *22 (N.D.N.Y. Mar. 28, 2014) (plaintiff's unsupported and highly improbable claims about Lt. Chase's admissions are not sufficient to overcome defendant Chase's sworn declaration, and no reasonable fact finder could conclude that he retaliated against the plaintiff). *See also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Jeffreys v. City of New York*, 426 F.3d at 554 (quoted above).

In light of the contrary medical evidence, no reasonable fact finder would credit plaintiff's unsupported claims that the lighting conditions in the RCTP had a serious adverse impact on his health or safety, as required to support the objective element of an Eighth Amendment claim. On that basis, I would recommend granting summary judgment in defendant's favor and dismissing plaintiff's sole remaining conditions-of-confinement claim. *See, e.g.*, *McGee v. Gold,* 2010 WL 5300805, at *5-8 (plaintiffs'

speculative and conclusory evidence fails to show that constant lighting, and any resulting loss of sleep, has been a cause of their injuries; without such a showing, there is no genuine issue of material fact on the question of whether continuous lighting has created a condition of confinement so extreme as to be unconstitutional) (collecting cases); *Murray v. Edwards County Sheriff's Dept.*, 248 F. App'x. 993, 998-89 & n. 6 (10th Cir. 2007) (plaintiff's contradictory allegations that continuous bright lights outside his cell for eleven months sometimes interfered with his sleep and caused him headaches did not establish a sufficiently serious harm to support his Eighth Amendment claim; nor did plaintiff establish that his severe depression was caused by the lighting conditions); *Huertas v. Secretary Pennsylvania Dept. of Corrections*, 533 F. App'x. 64, 68 & n.7 (3rd Cir. 2013) (upholding dismissal of Eighth Amendment claim on summary judgment because plaintiff had not provided competent medical evidence to show that he suffered serious psychological harm and eye problems because of the continuous lighting in the restricted housing unit); *Hamilton v. Smith*, 06-CV-805 (GTS/DRH), 2009 WL 3199531, at *4, 16 (N.D.N.Y. January 13, 2009) (plaintiff's dramatic and overstated claims of loss of sleep and insomnia due to exposure to bright lights that were not turned off in the SHU gallery for approximately six weeks were not sufficient to establish the objective prong of his Eighth Amendment claim) (Rep't- Rec.), *adopted as modified on other grounds,* 2009 WL 3199520 (N.D.N.Y. Sep 30, 2009); *Ouchie v. Ross*, No. 1:07-CV-0091, 2013 WL 593996, at *9, 11 (W.D.N.Y. Feb. 15, 2013) (no reasonable juror could find that plaintiff's exposure at the holding facility to bright lights for 24 hours per day for a

week caused an excessively serious risk to plaintiff's health and well-being).[13]

## III.  Qualified Immunity

Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted).  Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional

---

[13] Having concluded that plaintiff cannot establish the objective element of his Eighth Amendment claim, I need not address whether plaintiff can establish the subjective element–that defendant Graham acted with deliberate indifference to plaintiff's health and well-being.  Given the inconsistent penological/security justifications offered by Supt. Graham with respect to the lighting conditions in the RCTP in connection with his two summary judgment motions, there may well be a disputed issue of material fact with respect to the subjective element.

19

right." *Saucier v. Katz*, 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. Having concluded that plaintiff cannot establish that the lighting conditions in the RCTP violated his rights under the Eighth Amendment, this court need not decide whether defendant Graham would be entitled to qualified immunity.[14]

---

[14] Standing alone, the penological/security justification offered by defendant Graham in his March 2, 2015 declaration for continual, bright illumination for all inmates in the RCTP observation cells might well support summary judgment based on qualified immunity, based on the law in place at the time of conduct alleged in plaintiff's surviving claim. Neither the Supreme Court, nor the Second Circuit has ruled that continuous, full lighting in a prison setting, supported by adequate penological justification, would constitute an Eighth Amendment violation. Even the Ninth Circuit, which recognized, in *Keenan*, that continual, bright illumination in the prison setting may constitute cruel and unusual punishment, has held that it is "not clearly establish[ed] that constant illumination . . . done for a legitimate penological purpose" violates the Eighth Amendment. *See also Chappell v. Mandeville*, 706 F.3d at 1058-60 (granting summary judgment on qualified immunity grounds in favor of the defendants because the "fact-driven" decisional law would not have provided them with fair notice that their actions–subjecting plaintiff to seven full days of contraband watch under full lighting so that they could monitor him and prevent him from disposing of the contraband–violated the Eighth Amendment). However, as noted above, in his prior (April 16, 2014) declaration, defendant Graham essentially conceded that the night lights available in the RCTP allowed correction staff to adequately monitor the inmates in the observation cells who were not on suicide watch. The earlier declaration was prepared after Supt. Graham's alleged investigation of plaintiff's second (February 2013) grievance about the lighting in the RCTP, during which defendant Graham purportedly learned from staff that the brighter lighting was needed to adequately monitor inmates in the RCTP. (*See* Graham 3/2/2015 Dec. ¶ 16, 18 & Ex. B, Dkt. No. 116-4 at 5-6). The inconsistencies in defendant Graham's two declarations would create an issue of fact with respect to the bona fides of the penological justification he now offers for constant, bright lighting for RCTP inmates not on suicide watch. That, in turn, would create a material issue of fact as to whether a reasonable defendant official would have understood that his or her acts were unlawful under then-current law, or whether it was "objectively reasonable" for the Supt. Graham to believe that the conditions of confinement did not violate the constitutional rights of the inmates affected.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant Graham's second motion for summary judgment (Dkt. No. 116) be **GRANTED**, and that plaintiff's Fourth Amended Complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**Dated:  January 8, 2016**

Hon. Andrew T. Baxter
U.S.  Magistrate Judge